

**LORI S. SIMPSON**
**U.S. BANKRUPTCY JUDGE**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MARYLAND
## at Greenbelt

| | | |
|---|---|---|
| In re: | * | |
|    Fred Yen Ming Chu and | * | Case No. 18-20703-LSS |
|    Meiyu Anna Chu, | * | Chapter 7 |
|       Debtors. | * | |
| | * | |
| * * * * * * | * * * * * * | |
| Fu Quan Li, | * | |
|    Plaintiff, | * | |
| | * | |
| v. | * | Adv. No. 18-00401 |
| | * | |
| Fred Yen Ming Chu and | * | |
| Meiyu Anna Chu, | * | |
|    Defendants. | * | |
| | * | |

## MEMORANDUM OPINION

This adversary proceeding arises from a failed international trade venture spearheaded by Defendant, Fred Yen Ming Chu ("Mr. Chu") and focuses on loans (the "Loans") Plaintiff, Fu Quan Li ("Mr. Li"), provided Mr. Chu, through Mr. Chu's wife and co-defendant, Meiyu Anna Chu ("Ms. Chu") in furtherance of that venture. Plaintiff objects to the dischargeability of debt arising from Defendants' default on the Loans pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(4). This proceeding

came before the Court for a two-day trial on July 18 and 24, 2019. The Court took the matter under advisement following the conclusion of the trial.

## I. Findings of Fact.

Mr. and Ms. Chu are natives of Taiwan. They were married in 1978 and emigrated to the United States approximately seven years later. Upon arriving in the United States, they found jobs in the food service industry, Mr. Chu as a waiter and Ms. Chu as a bookkeeper. Around 1990, Mr. Chu purchased a Chinese restaurant in Rockville, Maryland. Five years later, Mr. Chu sold that restaurant and traveled internationally for three to four months to develop relationships with persons involved in international trade. Upon returning to the United States, Mr. Chu had a brief stint as a mail carrier, then returned to the restaurant business. Mr. Chu found a job in a Japanese restaurant, which afforded him an opportunity to gain experience making sushi.

In 1998, Mr. Chu left the Japanese restaurant and started his own sushi business based out of a strip mall in Rockville, Maryland. A substantial portion of Mr. Chu's business came from delivering sushi to local markets for resale. One year later, Mr. Chu's sushi business was flourishing, and he needed the assistance of another sushi chef. During his search for a sushi chef, Mr. Chu met Mr. Li. Mr. Li was born in Shanghai, China and emigrated to the United States in 1998. Despite Mr. Li's limited proficiency with English and his lack of experience as a sushi chef, Mr. Chu hired Mr. Li. Over the next five years, Mr. Chu taught Mr. Li to make sushi and worked closely with him in the business. Mr. Li developed profound respect for Mr. Chu's status and business acumen. The two became friends and close ties developed between their families.

In or around 2004, Mr. Chu moved his sushi business to his home and focused exclusively on preparing sushi to deliver to markets for resale. Mr. Chu no longer needed the assistance of a second sushi chef and terminated Mr. Li's employment. Mr. Chu's sushi business continued to

flourish. Mr. and Ms. Chu began investing in Florida real estate. While their Florida properties were encumbered by mortgages, Mr. and Ms. Chu's equity in their Florida real estate totaled approximately $1,000,000.00 by 2005. To further secure their financial position, Mr. and Ms. Chu paid off all debt on their Maryland home, which was worth approximately $500,000.00 at that time. In addition, Mr. and Ms. Chu accumulated approximately $400,000.00 in cash savings.

In 2005, Mr. Chu decided that they were financially secure enough that he could switch his focus to his true passion, international trade. In August 2005, Mr. Chu approached Mr. Li and offered him the opportunity to take over the sushi delivery business, which Mr. Li accepted. Mr. Chu introduced Mr. Li to his customers and informed the customers that Mr. Li would be delivering the sushi from now on and that they should remit payment to Mr. Li. Mr. Chu explained to Mr. Li that Mr. Chu intended to travel abroad to find opportunities in the trade of precious metals.

Mr. Chu believed that gold and copper were in high demand in China's rapidly growing manufacturing industry and spent years searching for an opportunity to capitalize on this belief. He found a business partner in Tanzania with connections to a copper mine in the Democratic Republic of the Congo. Mr. Chu visited Dar Es Salaam, a Tanzanian port city, in 2006 and 2007 in preparation to obtain copper to ship to China. Mr. Chu and his partner obtained two purchasers in China for 500 tons of high purity copper. Though it was not entirely clear from the testimony and no relevant documentary evidence was submitted, it appears that the agreement with the Chinese purchasers was that they would pay the prevailing market rate in China at the time they received the shipment in China. Mr. Chu and his partner expected a large profit from the arbitrage between the prevailing market rates in Tanzania and China.

In April 2008, with purchasers on board, Mr. Chu and his partner purchased high purity copper from a copper mine in the Democratic Republic of the Congo. Their supplier required a

30% down payment of approximately $1,400,000.00.   In addition, Mr. Chu and his partner had to obtain funds for insurance, shipping, and other incidental costs.   Mr. and Ms. Chu invested their cash savings of $400,000.00 and obtained a loan of $350,000.00 by granting a lien against their Maryland home, which was worth approximately $400,000.00 at the time.   After exhausting their personal finances, Mr. and Ms. Chu borrowed money from friends and family.

By April 2008, Mr. Chu had no funds available to pay ongoing expenses necessary to complete the copper shipment from Tanzania to China.   Mr. and Ms. Chu began searching for additional capital to prevent Mr. Chu's business venture from failing.   Around that time, Mr. Chu learned that he would need funds to pay for purity testing of his copper.   Mr. Chu informed Ms. Chu of his need for additional funds.   Thereafter, Ms. Chu contacted Mr. Li and told him that she had discovered that Mr. Chu was having an affair and requested that Mr. Li and his wife, Min Zhang Li ("Ms. Li"), come to her house.   Shortly thereafter, Mr. and Ms. Li and their daughter, Jing Li ("Jing"), arrived at Ms. Chu's home and found her in an emotionally distraught state.

After two hours of venting about Mr. Chu's affair, Ms. Chu changed the topic of conversation to Mr. Chu's business venture in Tanzania.   Ms. Chu showed pictures of Mr. Chu with his business partner in Tanzania next to a cargo train.   Ms. Chu requested a $12,000.00 loan from Mr. Li to help fund Mr. Chu's venture.   During their conversation, Ms. Chu received a phone call.   After ending the phone call, Ms. Chu stated that the caller was her real estate agent in Florida. Ms. Chu further represented that, if Mr. and Ms. Chu were unable to repay the loan from the profits of the business venture, they would sell one of their investment properties in Florida and repay the loan with the sale proceeds.   In reliance on Ms. Chu's representations, Mr. Li obtained $6,000.00 from his personal savings and $6,000.00 from Jing to make a $12,000.00 loan to Mr. and Ms. Chu. Ms. Chu then transferred that money to Mr. Chu via Western Union.

4

Less than a week later, Ms. Chu contacted Mr. Li requesting another loan. Mr. Li then met with Ms. Chu, where she showed him another picture of Mr. Chu with his business partner beside a pile of copper or gold. Ms. Chu represented that Mr. Chu's business venture was successful, but that he needed an additional $50,000.00 to complete the shipment. Ms. Chu further represented that Mr. and Ms. Chu would repay the loans within a month with 30% interest. If they were unable to repay the loan from the profits of the business venture, Ms. Chu said they would sell their Maryland home to repay the loan plus interest with the sale proceeds. Mr. Li loaned Mr. and Ms. Chu $50,000.00, which he obtained from his personal savings and loans from relatives. Mr. Li requested that Ms. Chu provide him with two checks totaling $50,000.00 as further security and memorialization of the loans. Ms. Chu wrote two checks, one for $40,000.00, payable to Mr. Li, and another for $10,000.00, payable to Ms. Li's brother. Ms. Chu then transferred that money to Mr. Chu via Western Union. Three weeks later, Ms. Chu contacted Mr. Li and told him not to cash the checks she had written because there was no money in Mr. and Ms. Chu's checking account.

In July 2008, Mr. Chu's first shipment of 500 tons of copper left the port in Tanzania heading to China. In August 2008, Ms. Chu traveled to Tanzania. At that time, Indian customs officials detained Mr. Chu's copper shipment and demanded payment in exchange for its release. Mr. and Ms. Chu had no funds available to pay the Indian official. Ms. Chu called Mr. Li from Tanzania and requested an additional $6,000.00 loan. Ms. Chu informed Mr. Li that the additional funds were necessary to complete the transaction and that, without the additional loan, Mr. and Ms. Chu would be unable to repay the previous loans. Ms. Chu again represented that Mr. and Ms. Chu would repay the loans within 30 days plus 30% interest. In reliance on these representations, Mr. Li transferred $6,000.00 to Mr. and Ms. Chu via Western Union.

By the time the Copper arrived in China, its value had plummeted. The sales price received

in China was barely enough to cover the remaining two-thirds of the Purchase Price. Mr. Chu had lost his entire investment. Soon after the failure of his Tanzanian enterprise, Mr. Chu returned to the United States. Upon his return, he visited the customers from his old sushi delivery business to inform them of his return as well as his intention to continue operating his sushi delivery business. Thereafter, Mr. Li's customers began purchasing sushi from Mr. Chu instead.

Soon after Mr. Chu's return, Mr. and Ms. Li began inquiring with Mr. and Ms. Chu about repayment of the Loans. Each time, Mr. and Ms. Chu informed Mr. and Ms. Li that they did not have the money to repay the Loans. In December 2008, Mr. and Ms. Chu agreed to pay Mr. Li $1,000.00 per month until the Loans were repaid. In January 2009, Mr. and Ms. Chu paid Mr. Li $1,000.00 toward repayment of the Loans. Mr. and Ms. Chu made two additional $1,000.00 payments in February and March 2009, for a total of $3,000.00. In April 2009, Mr. and Ms. Chu informed Mr. Li that they would no longer be making monthly payments but would repay the Loans once they sold their home.

In April 2009, Mr. and Ms. Chu purchased Hunan To Go, a Chinese restaurant in Rockville, Maryland. Mr. and Ms. Li were aggrieved to learn that Mr. and Ms. Chu had obtained the funds to purchase Hunan To Go but had not repaid the Loans. Mr. and Ms. Li and Jean assisted Mr. and Ms. Chu in preparing Hunan To Go for operation in hopes of receiving repayment of the Loans if the restaurant was successful. Mr. and Ms. Li continued inquiring about repayment of the Loans. On August 28, 2009, the tension over Mr. and Ms. Chu's nonpayment on the Loans and Mr. and Ms. Li's repayment inquiries resulted in a shouting match inside Hunan To Go and carrying into the parking lot. The altercation so bothered Ms. Chu that she attempted to drive away in Mr. Chu vehicle. Ms. Chu is not a competent driver under normal circumstances. In her emotionally frayed state, she drove Mr. Chu's vehicle into Ms. Li's vehicle in the Hunan To Go parking lot.

On December 10, 2009, Mr. Li filed a Complaint for Monetary Damages in the Circuit Court for Montgomery County, Maryland, seeking damages against Mr. and Ms. Chu for fraud, breach of fiduciary duty, and breach of contract.  On August 24, 2010, the state court entered sanctions against Mr. and Ms. Chu based on their failure to properly participate in discovery.  As part of the sanctions, the Court prohibited Mr. and Ms. Chu from admitting evidence they failed to produce in response to Mr. Li's discovery requests.  On November 5, 2010, the Court declared Mr. and Ms. Chu in default and set a hearing on damages.  On January 3, 2011, the Court entered Judgment in favor of Mr. Li for breach of contract and awarded compensatory damages in the amount of $81,800.00 but denied Mr. Li's request for punitive damages and attorney fees.

## II.     Conclusions of Law.

The cornerstone of the bankruptcy system is the discharge of debts.  However, Section 523 of the Bankruptcy Code excludes certain debts from discharge.  *See generally* 11 U.S.C. § 523(a).  Establishing a non-dischargeable debt under Section 523 requires a two-step process.  First, the creditor must establish the existence of a debt under non-bankruptcy law (e.g., state law).  Thereafter, the Court must determine whether the debt is non-dischargeable.  Here, the existence and amount of the debt was established in state court.[1]  Now, Plaintiff contends that such debt is non-dischargeable pursuant to §§ 523(a)(2)(A) and (a)(4).

As an initial matter, "the marital relationship alone is not enough to impute one spouse's fraud to the other for nondischargeability purposes." *In re Boyd*, 525 B.R. 299, 307 (Bankr. M.D.N.C. 2015) (*quoting In re Hill*, 425 B.R. 766, 774 (Bankr. W.D.N.C. 2010)).  However, where the married couple are business partners, the court will impute one spouse's fraud to the other.  *See*

---

[1] The Court addresses the collateral estoppel effect of the state court judgment in the Memorandum Opinion on Motion to Reconsider entered commensurately herewith.

7

*In re Simone*, 509 B.R. 6, 11 (Bankr. D. Md. 2014). "Under Maryland law, a partnership need not be evidenced by a writing; a partnership may be found where 'the circumstances and acts of the parties indicate an intention to create a partnership.'" *Id.* (*quoting Gosman v. Gosman*, 271 Md. 514, 318 A.2d 821 (1974)). Here, Mr. and Ms. Chu were acting as business partners with respect to Mr. Chu's business venture in Tanzania. Further, Ms. Chu was acting in furtherance of that venture in seeking the Loans.

### A. Section 523(a)(2)(A).

Courts must construe exceptions to discharge narrowly, "to protect the purpose of providing debtors a fresh start." *In re Rountree*, 478 F.3d at 219. Section 523(a)(2)(A) excepts from discharge any debt for money, property, services or credit to the extent the money, property, services, or credit was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." In other words, "Congress excepted from discharge . . . debts in which the debtor used fraudulent means to obtain money, property, services, or credit. *In re Rountree*, 478 F.3d 215, 219 (4th Cir. 2007). In short, "§ 523(a)(2) [protects] creditors who were tricked by debtors into loaning them money or giving them property, services, or credit through fraudulent means." *Id.* at 219–20.

A creditor asserting a claim under § 523(a)(2)(A) bears the burden of proving the following by a preponderance of evidence: "(1) that the defendant made a representation, (2) that the defendant knew at the time the representation was made that it was false, (3) that the defendant made the representation with the intent and purpose of deceiving the plaintiff, (4) that the plaintiff justifiably relied upon the false representation, and (5) that the plaintiff suffered damages as a proximate result of the representation." *In re Rixham*, 578 B.R. 287, 307 (Bankr. D. Md. 2017).

As to the first element, the representation "must relate to a present or past fact." *In re*

8

*Owens*, 549 B.R. 337, 355 (Bankr. D. Md. 2016) (*quoting In re Conlin*, 294 B.R. 88, 100 (Bankr. D. Minn. 2003)). As such, statements of opinion, expectation, or intention generally do not satisfy the representation requirement of § 523(a)(2)(A). *In re Criswell*, 52 B.R. 184, 197 (Bankr. E.D. Va. 1985). "It is only when the declarant does not hold these opinions or utters them with reckless indifference for their truth that the requisite fraud can be found." *In re Schwartz & Meyers*, 130 B.R. 416, 423 (Bankr. S.D.N.Y. 1991).

While the distinction between fact and opinion is not always clear, courts are more likely to conclude that quantitative statements satisfy the first element, whereas courts often find statements of a qualitative nature to be opinion or sale puffery. *Compare In re Copeland*, 291 B.R. 740, 762 (Bankr. E.D. Tenn. 2003) (statement that a company was "very profitable . . . can only legitimately be classified as puffery and opinion.") *with In re Goodwich*, 517 B.R. 572, 579 (Bankr. D. Md. 2014) (finding a false representation where debtor provided a profit and loss statement that showed a net profit of $301,359 from three previous ventures and an expected profit of $145,000.00 from subject venture where no profit had been realized from the three previous ventures). The parties' relationship is also relevant when distinguishing between fact and opinion. If there is a formal relationship of trust between the parties and the statement relates to the declarant's area of expertise, courts are more likely to find statements teetering on the boundary of fact and opinion to be factual. *Compare In re Schwartz & Meyers*, 130 B.R. 416, 421 (Bankr. S.D.N.Y. 1991) (statement that investment was "as safe as in a bank" from plaintiff's then boyfriend and agent of debtor was merely puffery or opinion) *with In re White*, 128 Fed. Appx. 994, 998 (4th Cir. 2005) (unpublished) (debtor's representation that investment was safe was a fraudulent misrepresentation where debtor was acting as plaintiff's financial planner).

Ms. Chu made numerous representations in connection with soliciting the Loans. Ms. Chu

represented that Mr. Chu's business venture was successful; that the Loans would be repaid within a month; and that, if necessary, they would repay Mr. Li from their sale of the real estate holdings. Each of Ms. Chu's representations were statements of opinion, expectation, or intention. Plaintiff failed to satisfy his burden of establishing that Ms. Chu did not hold these opinions, expectations, or intentions. To the contrary, the evidence showed that Ms. Chu believed that her husband's venture was successful and that they would have no difficulty repaying the Loans according to their terms. Further, while Mr. Li held Mr. and Ms. Chu in high esteem and considered them close friends, their relationship was not the type of formal relationship that would give Ms. Chu's statements of opinion the air of objective fact.

Based on the foregoing, Plaintiff failed to satisfy his burden of establishing that Defendants made a misrepresentation of fact. Accordingly, the Court finds and concludes that it must grant judgment in Defendants favor on Plaintiff's cause of action for non-dischargeability under § 523(a)(2)(A).

**B.     Section 523(a)(4).**

Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Plaintiff alleges neither embezzlement nor larceny. Accordingly, to obtain relief under Section 523(a)(4), Plaintiff "must establish that [Defendants were] acting in a fiduciary capacity. . . [and] that while acting in that capacity [they] committed a fraud or defalcation." *In re Kelley*, 948 F.2d 1281 (4th Cir. 1991) (unpublished). "[T]he issue of whether the debtor was acting in a fiduciary capacity is ultimately a federal question." *In re Heilman*, 241 B.R. 137, 158 (Bankr. D. Md. 1999) (*citing In re Lang*, 108 B.R. 586 (Bankr. N.D. Ohio 1989)). The term "fiduciary capacity" is strictly construed for the purposes of Section 523(a)(4), such that "[t]he necessary relationship must arise from a preexisting express or

technical trust. That is, '[i]t is not enough that by the very [alleged] act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio. He must have been a trustee before the wrong and without reference thereto.'" *In re Kelley*, 948 F.2d 1281 (4th Cir. 1991) (unpublished) (*quoting Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934)). Here, there is no evidence that Mr. or Ms. Chu were fiduciaries of Mr. Li. While Mr. Li thought highly of Mr. and Ms. Chu, their relationship was not a fiduciary relationship as the term is used in Section 523(a)(4).

### **III.**   **Conclusion.**

Based on the foregoing, the Court finds and concludes that it should render judgment in favor of Defendants on all counts. The Court will enter a judgment consistent with this Memorandum Opinion.

cc:     All parties

**End of Order**